**Constancia A. Vda de DAYLO**

v.

**ADMINISTRATOR OF VETERANS' AFFAIRS, Appellant**

**No. 71-1241.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 19, 1973.

Decided June 26, 1974.

David V. Seaman, Atty., Dept. of Justice, with whom Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, was on the brief, for appellant.

Harold J. Nussbaum, Washington, D. C., for appellee.

Before FAHY, Senior Circuit Judge, and WRIGHT and MacKINNON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

The Administrator of Veterans' Affairs appeals denial of his motion,[1] under Rule 60(b),[2] Federal Rules of Civil Procedure, for relief from a final, unappealed judgment in the nature of mandamus[3] ordering him to pay certain death compensation benefits to appellee Daylo, the widow of a serviceman killed in World War II. The Administrator grounds his motion on certain veterans' legislation, Section 8(a) and (b) of the Act of August 12, 1970, 38 U.S.C. §§ 211(a) and 3111 (1970),[4] enacted after

the final judgment became unappealable. If, as the Administrator contends, these provisions aim to upset judgments, like Mrs. Daylo's, which are final, no longer subject to appeal, and concerned with past legal and factual relationships, the provisions are of dubious constitutionality. Wherever such is fairly possible, we must construe congressional enactments so as to preserve them from constitutional doubt. Reading the language of these enactments against their legislative history, we are not persuaded that Congress intended to disturb judgments like Mrs. Daylo's. Accordingly, denial of the Administrator's motion for relief from the judgment was proper, and it is affirmed.

I

From 1945 to 1951 the Veterans' Administration (VA) paid widow's benefits to Mrs. Daylo under 38 U.S.C. § 321.[5] In 1951, however, the Administration notified her that benefits would cease unless she could prove that she had "not remarried"—a statutory condition of eligibility.[6] This action conformed to

---

1. Daylo v. Administrator of Veterans' Affairs, D. D.C., Civil Action No. 1604–69 (order of Jan. 25, 1971), JA at 26a.

2. So far as here pertinent, Rule 60(b) provides:

   On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: * * * (4) the judgment is void; (5) * * * it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time * * *. * * *

3. Daylo v. Administrator of Veterans' Affairs, D. D.C., Civil Action No. 1604–69 (order of May 7, 1970 granting partial summary judgment to plaintiff), JA at 21a–22a.

4. Pub.L. 91–376, 84 Stat. 787–790.

5. This basic entitlement statute has undergone several amendments since World War II which are not relevant to the present case. The provision now reads:

   The surviving widow, child or children, and dependent parent or parents of any

veteran who died before January 1, 1957 (or after April 30, 1957, under the circumstances described in section 417(a) of this title) as the result of injury or disease incurred in or aggravated by active military, naval, or air service, in line of duty, during a period of war, shall be entitled to receive compensation at the monthly rates specified in section 322 of this title.

38 U.S.C. § 321 (1970).

6. Prior to Sept. 19, 1962, the term "widow" was defined as follows, for purposes of Title 38:

   The term "widow" means * * * a woman who was the wife of a veteran * * * and who has not remarried (unless the purported remarriage is void). 38 U.S.C. § 101(3) (1958). The provision was amended by the Act of Sept. 19, 1962, § 1, Pub.L. 87–674, 76 Stat. 558, so that it now reads, in pertinent part:

   The term "widow" means * * * a woman who was the· wife of a veteran * * * and who has not remarried or (in cases not involving remarriage) has not since the death of the veteran, and after September 19, 1962, lived with another man and held herself out openly to

the VA's administrative practice of shifting the burden of proof on the remarriage question to any widow-beneficiary living with another man and holding herself out to the community as his wife.[7] Mrs. Daylo sought to prove she had not remarried, but the Administrator found otherwise and terminated her benefits.[8]

In no other circuit but ours would this controversy have found its way into the courts.[9] Since 1940 benefits disputes had been subject to a "no review" statute which, until its amendment in 1970, provided that decisions of the Administrator

> on any question of law or fact concerning a claim for benefits or payments under any law administered by the Veterans' Administration shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision.

38 U.S.C. § 211(a) (1964).[10] The view developed in this circuit,[11] but in no other,[12] that the phrase "claim for benefits or payments" referred not to all benefits disputes but only to those involving *initial* benefit claims. It was our lonesome opinion that judicial review remained for disputes involving *termination* of benefits by the VA.

Needless to say, this position brought us a great deal of business. Many of these cases involved the VA's practice, in administering widows' benefits, of shifting the burden of proof on the remarriage question to the beneficiary.[13] We were unable to find statutory authority for the practice. *See* Sinlao v. United States, 106 U.S.App.D.C. 263, 271 F.2d 846 (1959). In 1962 Congress entered the dialogue by amending 38 U.S.C. § 101(3) to provide that a "widow," to be eligible for benefits, must not have "lived with another man and held herself out openly to the public to be the

---

the public to be the wife of such other man.
38 U.S.C. § 101(3) (1970).

7. This administrative practice is outlined in a letter from the Administrator to the Chairman of the House Committee on Veterans' Affairs dated June 9, 1970, included in H.R. Rep.No. 91–1166, 91st Cong., 2d Sess. (to accompany H.R. 17958) at 22 (1970).

8. The administrative history of Mrs. Daylo's case is traced in the affidavit of Theodore K. Chamberlain, Attorney, Office of the General Counsel, Veterans' Administration, filed with the District Court on Nov. 17, 1969. JA at 13a–15a.

9. *See generally* Johnson v. Robison, 415 U.S. 361, 366–374, 94 S.Ct. 1160, 1165–1169, 39 L.Ed.2d 389 (1974), *and* de Rodulfa v. United States, 149 U.S.App.D.C. 154, 158–164, 461 F.2d 1240, 1244–1250, cert. denied, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972).

10. The first "no review" provision was actually contained in § 5 of the Economy Act of 1933, 48 Stat. 9, which created the present Veterans' Administration. That statute provided:

> All decisions rendered by the Administrator of Veterans' Affairs under the provisions of this title * * * shall be final and conclusive on all questions of law and fact, and no other official or court of

the United States shall have jurisdiction to review by mandamus or otherwise any such decision.
The statute was amended in 1940, 54 Stat. 1197, to read:

> Notwithstanding any other provisions of law * * * the decisions of the Administrator of Veterans' Affairs on any question of law or fact concerning a claim for benefits or payments under this or any other Act administered by the Veterans' Administration shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decisions.

A final and minor rewording appeared in the Veterans' Benefits Act of 1957, 71 Stat. 92, yielding the language quoted in text.

11. Tracy v. Gleason, 126 U.S.App.D.C. 415, 379 F.2d 469 (1967); Thompson v. Gleason, 115 U.S.App.D.C. 201, 317 F.2d 901 (1962); Wellman v. Whittier, 104 U.S.App.D.C. 6, 259 F.2d 163 (1958).

12. *See, e. g.,* Redfield v. Driver, 9 Cir., 364 F.2d 812 (1966); Milliken v. Gleason, 1 Cir., 332 F.2d 122 (1964), cert. denied, 379 U.S. 1002, 85 S.Ct. 723, 13 L.Ed.2d 703 (1965); Smith v. Settle, 8 Cir., 286 F.2d 420, cert. denied, 366 U.S. 969, 81 S.Ct. 1932, 6 L.Ed.2d 1259 (1961); Magnus v. United States, 7 Cir., 234 F.2d 673 (1956).

13. *See* H.R.Rep.No.91–1166, *supra* note 7, at 9–10.

wife of such other man." [14] By establishing a hard and fast rule this amendment went beyond the VA's own practice of merely shifting the burden of proof as to ceremonial remarriage. Recognizing this, Congress expressly gave the 1962 amendment prospective effect only. But the Senate Committee reporting out the amendment stated its understanding that the VA could apply its burden-shifting rule to instances of alleged remarriage occurring prior to 1962.[15] This understanding, having no statutory force, was not adopted by the courts in this circuit.[16]

With this background, we may again pick up the thread of Mrs. Daylo's story. In 1969 she brought a mandamus action in the District Court to compel payment of the death compensation benefits denied her since the early 1950's. On May 7, 1970 the court granted partial summary judgment for Mrs. Daylo "with respect to benefits payable prior to September 19, 1962" [17] (*i.e.*, prior to the amendment, mentioned above, of 38 U.S.C. § 101(3)). The post-1962 claims were reserved for later decision, but the District Judge made the partial judgment final and appealable under Rule 54(b).[18] The judgment required the Administrator to pay Mrs. Daylo her

pre-1962 benefits "within 120 days." Deliberately, but for reasons not vouchsafed to us, the Government chose not to appeal Mrs. Daylo's judgment.

After the 60-day period for noting appeal had lapsed,[19] but still within the "120 days" granted by the District Court to the VA for compliance, Congress passed the Act of August 12, 1970, Pub.L. 91–376, 84 Stat. 787. Armed with this legislation, the Administrator moved under Rule 60(b) for relief from the judgment. Mrs. Daylo resisted the motion, but has not yet invoked court process to force compliance with the judgment. The court agreed to dismiss Mrs. Daylo's pending claims for post-1962 benefits, which decision Mrs. Daylo does not contest, but the court refused to vacate the final judgment involving pre-1962 benefits because it "was legally entered and no appeal was taken therefrom, and * * * the validity of that judgment is unaffected by the passage of Public Law 91–376." [20]

II

The Administrator contends that Section 8(a) and (b) of the new Act directly conflicts with Mrs. Daylo's judgment in the nature of mandamus.[21] Section

---

14. *See* note 6 *supra*.

15. *See* S.Rep.No.1842 (Committee on Finance), 87th Cong., 2d Sess., 2 & 6 (1962). The House Committee on Veterans' Affairs had proposed the same amendment without language limiting its effect to future cases. *See* H.R.Rep.No.1459, 87th Cong., 2d Sess., 2 (1962).

16. H.R.Rep.No.91–1166, *supra* note 7, at 23.

17. *See* note 3 *supra*.

18. Rule 54(b), Fed.R.Civ.P.:

*Judgment upon multiple claims or involving multiple parties.*

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judg-

ment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

19. *See* Rule 4(a), Fed.R.App.P., *and* 28 U.S.C. § 2107 (1970).

20. *See* note 1 *supra*.

21. The Administrator also raises three other arguments for upsetting her judgment which do not require extended discussion:

(1) The Administrator urges that we take this opportunity to overrule retroactively Tracy v. Gleason, *supra* note 11, on the basis of which the court entering Mrs. Daylo's judgment had founded its jurisdiction. This

8(a) retroactively amended the "no review" statute, 38 U.S.C. § 211(a), to erase the distinction, located by this circuit alone, between initial benefit claims and benefit terminations. The "no review" provision now reads:

On and after October 17, 1940, except as provided in sections 775, 784, and as to matters arising under chapter 37 of this title, the decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans and their dependents or survivors shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise.

Section 8(b) added a new provision, 38 U.S.C. § 3111, to ratify the VA's burden-shifting rule with respect to pre-1962 instances of alleged remarriage.

There shall be no payment of dependency and indemnity compensation, death compensation, or death pension which, because of a widow's relationship with another man before enactment of Public Law 87–674, would not have been payable by the Veterans'

Administration under the standard for determining remarriage applied by that agency before said enactment.

In the Administrator's view, 38 U.S.C. § 211(a) conflicts with Mrs. Daylo's judgment by retroactively withdrawing the jurisdiction of the court which entered the judgment, thus rendering the judgment void. The Administrator finds a second conflict with the judgment by construing 38 U.S.C. § 3111 as a legislative command directly contrary to the mandamus incorporated in the judgment. According to the VA, the court's mandate requires exactly that which the statutory provision forbids, i. e., "payment of * * * death compensation * * * which, because of a widow's relationship with another man before enactment of Public Law 87–674, would not have been payable by the Veterans' Administration under the standard for determining remarriage applied by that agency before said enactment."

The Administrator's several contentions go an important step further than those considered, and accepted, in de Rodulfa v. United States, 149 U.S.App.D.C. 154, 461 F.2d 1240, cert. denied, 409 U. S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972). There, judgment had been entered in the District Court against the

would "void" the judgment. The argument ignores the status of this litigation. If the Administrator thought Mrs. Daylo's judgment had been,* for whatever reason, mistakenly entered, an appeal should have been prosecuted. Instead, after the opportunity for appeal had lapsed the Administrator brought a Rule 60(b) motion in the District Court. It is the denial of that motion, not the original entry of judgment for Mrs. Daylo, which is presently before us.

An appeal from a denial of the 60(b) motion brings up for review only the correctness of that order, and does not bring up for review the final judgment.

7 W. Moore, Federal Practice ¶ 60.29 at 414–415 (2d ed. 1974).

(2) The Administrator argues that legislation can always cancel veterans' benefits because no person has a "vested right" to these. This argument is irrelevant to the case before us. Mrs. Daylo claims no vested right to veterans' benefits as such but only to the award of benefits incorporated in a final judgment no longer subject to appeal.

The "vesting" in question is that assertedly accomplished by the final judgment.

(3) The Administrator contends that Mrs. Daylo's judgment has become functus officio by its own terms. The judgment commands the VA to pay Mrs. Daylo her pre-1962 benefits "in accordance with the applicable statutes and regulations," and the Administrator argues that § 8 of the Act of Aug. 12, 1970 altered the "applicable statutes." We are unpersuaded that the District Court intended the quoted phrase to subject its ruling to retroactive changes in statutory law; the phrase appears to mean only that the time, place, and manner of the payment are to be controlled by statutes and regulations prevailing at the time of judgment. At any rate, we hold below that § 8 was not intended by Congress to upset final judgments, no longer subject to appeal, which deal with benefit periods occurring prior to entry of judgment. For this reason alone the new legislation is not "applicable" under the terms of the judgment.

VA in a benefits dispute, and the VA had appealed only the accompanying award of attorneys' fees, allowing the judgment for the beneficiaries themselves to become final. While the appeal of the fee award was pending here, Congress enacted the amendment to 38 U.S.C. § 211(a), and the Administrator urged that the fee award accordingly be vacated on jurisdictional grounds. Recognizing that judgments awaiting decision on appeal are not "final," we agreed:

> * * * We cannot reconcile the specification in the amended section of a date almost 30 years earlier with any notion that Congress intended these proscriptions to apply only to litigation commenced from the date of amendment forward. We see no purpose to be served by reaching back to the effective date of the older finality statute than to impart to it a meaning Congress felt it should always have had. That objective could be achieved only by intercepting noncontractual claims already in court as well as those that had not arrived, and that is obviously what Congress did. *We hold that Section 211(a) in amended form was directed at pending as well as future judicial reviews of the Administrator's determinations on claims for noncontractual benefits.*

149 U.S.App.D.C. at 163–164, 461 F.2d at 1249–1250 (emphasis added). We took pains to restrict this holding to judgments pending appeal.

> We agree that the judgments exclusive of the fee awards—that is, the portions directing payment of benefits to the widow-claimants—are beyond the purview of these appeals. Those portions are adjudications by the District Court that became final, because they were not appealed, before the change in Section 211(a) was forthcoming. Nothing we can do on the present appeals can affect them, and nothing we say now is intended to reflect upon them. * * *

149 U.S.App.D.C. at 160, 461 F.2d at 1246. We were also careful to point out

the many constitutional "holdings that a change of law does not retroactively affect a proceeding which has already been terminated by a final judgment prior to the change." 149 U.S.App.D.C. at 166, 461 F.2d at 1252.

■ If, as the Administrator asserts, Sections 211(a) and 3111 aim to upset final judgments no longer subject to appeal, we are confronted with a serious constitutional dilemma. The applicable general rule is of long standing:

> * * * It is not within the power of a legislature to take away rights which have been once vested by a judgment. Legislation may act on subsequent proceedings, may abate actions pending, but when those actions have passed into judgment the power of the legislature to disturb the rights created thereby ceases. * * *

McCullough v. Virginia, 172 U.S. 102, 123–124, 19 S.Ct. 134, 142, 43 L.Ed. 382 (1898). A contrary general rule would subject all judicial action to superior legislative review, a regime obviously inconsistent with due process of law and subversive of the constitutional independence of the judicial branch of government. We recognize that there are exceptional circumstances where final judgments may be upset or altered by subsequent legislation, but we have great difficulty fitting Mrs. Daylo's judgment within the established exceptions to the general rule.

In the seminal case, State of Pennsylvania v. Wheeling & Belmont Bridge Co. (*Wheeling Bridge Case*), 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855), the Supreme Court held that Congress could retroactively legalize a bridge, built over an interstate waterway, despite a prior judicial decree ordering that the bridge be raised or removed to permit passage of shipping. The decree had been won by a private party alleging that this obstruction of commerce caused him special damage for which there existed no adequate remedy at law. The Court, in vacating the decree, accepted "as a general proposition, * * * especially as it respects adjudication upon the private

rights of parties," that legislation "cannot have the effect and operation to annul the judgment of the court already rendered, or the rights determined thereby in favor of the plaintiff." *Id.* at 431. But the Court distinguished the case before it "so far as it respects that portion of the decree directing the abatement of the bridge." *Id.* The judgment was vulnerable to retroactive legislation only to the extent that the remedy chosen—an injunctive decree rather than damages at law—directly affected public rights.[22] Accordingly, the award of costs to the plaintiff which had accompanied the decree was left undisturbed by the Court. *Id.* at 436. This emphasis upon remedies chosen was reaffirmed in The Clinton Bridge, 77 U.S. (10 Wall.) 454, 19 L.Ed. 969 (1870), which held that an enactment validating the legality of a bridge required dismissal of a pending suit in equity to have the bridge removed but might not similarly require dismissal of a pending suit at law for damages occasioned by the bridge.

In Hodges v. Snyder, 261 U.S. 600, 43 S.Ct. 435, 67 L.Ed. 819 (1923), it was held that legislation could validate consolidation of a school district despite a prior decree enjoining the consolidation:

> [A] suit brought for the enforcement of a public right * * * even after it has been established by the judgment of the court, may be annulled by subsequent legislation and should not be thereafter enforced; although, in so far as a private right has been incidentally established by such judgment, as for special damages to the plaintiff or for his costs, it may not be thus taken away.

*Id.* at 603–604, 43 S.Ct. at 436. In System Federation v. Wright, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), the Court held that amendment of the Railway Labor Act required modification of a consent decree, entered under the original Act, which had permanently enjoined a labor union arrangement expressly legalized by the amendment.

> There is * * * no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen. * * *

---

22. But, although this right of navigation be a public right common to all, yet, a private party sustaining special damage by the obstruction may, as has been held in this case, maintain an action at law against the party creating it, to recover his damages; or, to prevent irreparable injury, file a bill in chancery for the purpose of removing the obstruction. In both cases, the private right to damages, or to the removal, arises out of the unlawful interference with the enjoyment of the public right, which, as we have seen, is under the regulation of congress. Now, we agree, if the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress. It would have depended, not upon the public right of the free navigation of the river, but upon the judgment of the court. The decree before us, so far as it respect the costs adjudged, stands upon the same principles, and is unaffected by the subsequent law. But that part of the decree, directing the abatement of the obstruction, is executory,

a continuing decree, which requires not only the removal of the bridge, but enjoins the defendants against any reconstruction or continuance. Now, whether it is a future existing or continuing obstruction depends upon the question whether or not it interferes with the right of navigation. If, in the mean time, since the decree, this right has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is quite plain the decree of the court cannot be enforced. There is no longer any interference with the enjoyment of the public right inconsistent with law, no more than there would be where the plaintiff himself had consented to it, after the rendition of the decree. Suppose the decree had been executed, and after that the passage of the law in question, can it be doubted but that the defendants would have had a right to reconstruct it? And is it not equally clear that the right to maintain it, if not abated, existed from the moment of the enactment? *Wheeling Bridge Case,* 59 U.S. (18 How.) 421, 431–432, 15 L.Ed. 435 (1855).

*Id.* at 647, 81 S.Ct. at 371. *See* Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, Inc., 312 U.S. 287, 298, 61 S.Ct. 552, 85 L.Ed. 836 (1941), and United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). Finally, in McGrath v. Potash, 91 U.S.App.D.C. 94, 199 F.2d 166 (1952), there was at issue the continuing validity of a final decree requiring that certain private litigants not be deported except by procedures set out in the Administrative Procedure Act. Subsequent to entry of the injunctive decree, Congress had expressly exempted deportation proceedings from that Act. We vacated the decree, "[t]he statutory basis for the injunction having been removed by Congress." 91 U.S.App.D.C. at 96, 199 F.2d at 167.

■ Mrs. Daylo's judgment, like those upset by legislation in these earlier cases, had a prospective effect in that the Administrator was given "120 days" in which to comply. But this crude resemblance can hardly be considered dispositive. An award of damages at law, which all authorities agree is immune from legislative alteration, is also "prospective" to the extent that compliance by the judgment debtor may be less than instantaneous. Like an action for damages, a mandamus action sounds in law, not equity, and when the mandate calls merely for payment of a past obligation, it can be distinguished from a conventional money judgment only on the most formal of grounds. No case has yet held that a judgment is vulnerable to legislative annullment merely because the judgment had not yet been complied with when the legislation was enacted. Rather, such vulnerability would seem to depend on the character of the compliance called for. Thus, in *Wheeling Bridge Case, supra,* The Clinton Bridge, *supra,* Hodges v. Snyder, *supra,* and System Federation v. Wright, *supra,* the judicial decrees at issue called for actions which would have directly affected the rights of many persons not privy to the judgments, *i. e.,* would have trenched upon "public rights." In McGrath v.

Potash, *supra,* the decree was addressed only to the parties to the litigation but it did purport to freeze their legal relations for the indefinite future: The immigration authorities were required to use a complex set of procedures in any future attempt to deport the plaintiffs. What appears to unite these cases is that the injunctive decrees at issue were "legislative" in function, attempting to control the legal status of a variety of future actions which the parties, or others, might or might not wish to take.

> The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative.

United States v. Swift & Co., *supra,* 286 U.S. at 114, 52 S.Ct. at 462. The mandamus issued in the present case does not serve "legislative" functions. No more than would a money judgment does this mandamus speak to the VA's future relations with Mrs. Daylo, or with any other claimant, concerning as yet undecided benefits disputes. Nor is the mandamus directed at Mrs. Daylo's right to future benefits and thus at facts and conditions "provisional and tentative" in nature. The mandamus was issued entirely on the basis of events long since concluded. Like that of a money judgment, the force of the mandamus is self-terminating upon a single act of compliance; the VA is not bedeviled here by continuing judicial supervision or a "permanent" decree.

■■ In sum, to hold that Congress could annul Mrs. Daylo's judgment would be to enlarge substantially the exception carved by applicable precedent in the general, constitutional rule that rights vested in final judgments, no longer subject to appeal, are immune from legislative alteration. Thus, were we to accept the VA's construction of 38 U.S.C. §§ 211(a) and 3111, serious doubts would arise as to the constitutionality of those provisions. Where

there exist "serious questions concerning the constitutionality" of legislation, "it is a cardinal principle" that the courts "will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question[s] may be avoided." Johnson v. Robison, 415 U.S. 361, 367, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974), *quoting* United States v. Thirty-seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971). *See also* Lynch v. Overholser, 369 U.S. 705, 710–711, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); International Assn of Machinists v. Street, 367 U.S. 740, 749–750, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Furthermore, where a statute lies in the shadow of constitutional doubt, its proper construction will usually require an exploration of legislative history.

> [W]hen one interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a "clear statement" of a contrary legislative intent.

United States v. Thompson, 147 U.S. App.D.C. 1, 5, 452 F.2d 1333, 1337 (1971), cert. denied, 405 U.S. 998, 92 S. Ct. 1251, 31 L.Ed.2d 467 (1972).

### III

We consider first 38 U.S.C. § 211(a), the amended "no review" statute. The Administrator locates an intent to annul final judgments in the fact that Congress made the amendment retroactive to October 17, 1940, the date of enactment of the first "no review" statute. This is not an untenable argument, but it overlooks another possible explanation for the retroactivity language. Congress might well have thought that, absent such language, the amendment would be judicially construed to apply only prospectively, with no effect on pending suits and judgments not yet final at the time of enactment. The Supreme Court has long held that "[r]etroactivity, even where permissible, is not favored, except upon the clearest mandate." Claridge Apartments Co. v. Comm'r of Internal Revenue, 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944). For this reason, our conclusion in de Rodulfa v. United States, *supra,* that 38 U.S.C. § 211(a) applies to pending as well as new cases relied very heavily on the retroactivity language in the provision, 149 U.S.App.D.C. at 161, 163–164, 461 F.2d at 1247, 1249–1250. It might be objected that Congress would not have stretched retroactivity back 30 years if the only purpose were to intercept pending cases and nonfinal judgments. But this argument overlooks the fact that many of the suits pending in the courts when the provision was debated dealt with benefits owing for years "as early as the 1940's." [23]

Indeed, we think the 30-year reach of the retroactivity language militates rather strongly against the view that the language aimed to nullify final judgments no longer subject to appeal. It would be an extraordinary gesture for Congress to obliterate judgments rendered over a 30-year period and thereby empower the VA to sue for return of all moneys paid out on those old judgments. At oral argument the VA informed us that it has decided not to bring suit against judgments already paid, presumably because such a course would be an affront to both common sense and fair play. But the VA's formal interpretation of 38 U.S.C. § 211(a) imputes to Congress an intent to authorize just such a course. Nowhere in the legislative history of the provision can we find any reference to such an intent; certainly there is no "clear statement" of it.

The retroactive amendment of 38 U. S.C. § 211(a) had its origin in a proposal, supported by the VA, to redefine the term "claim" in all of Title 38 of the Code [24]; the redefinition was to make

---

23. *See* H.R.Rep.No. 91–1166, *supra* note 7, at 24.

24. This proposal was H.R. 17564, 91st Cong., explained by the Administrator in a letter to

clear that the term covered benefit terminations as well as initial benefits claims. The VA urged that the redefinition be made retroactive to October 17, 1940:

> * * * From an examination of the legislative history of Public Law 866, 76th Congress [which enacted the first "no review" statute on October 17, 1940], it seems quite clear that the Congress intended the exemption from judicial review therein enacted to be all-inclusive and did not contemplate the construction adopted in the *Wellman, Thompson,* and *Tracy* decisions [of the D.C. Circuit]. Since the pending bill would, if enacted, remove all doubt as to the intended scope of the existing finality provisions, the Veterans' Administration strongly endorses the bill's enactment.

While we cannot furnish any precise estimate of the savings to be effected through the enactment of H.R. 17564, a study by the Veterans' Administration of the first 32 judgments adverse to the Administrator, has shown that accrued and estimated future payments in those cases alone will total in excess of $1.4 million. As

heretofore noted, nearly all of these judgments involved application of the presumption of * * * remarriage rule.[25]

We think there is a clear distinction between an intent to "remove all doubt as to the intended scope of the existing finality provisions" and an intent to upset final, unappealable judgments entered—perhaps years earlier—under those provisions. The quoted statement does of course mention "32 judgments adverse to the Administrator," but there is no clear statement that these would be overturned by the proposed amendment or, indeed, that these judgments were, at the time, final and no longer subject to appeal. Elsewhere in its statement, the VA focused on cases then moving through the courts (*i. e.*, pending cases) and on the possibility of "millions" of new cases in the future.[26]

The House Committee decided to amend 38 U.S.C. § 211(a) directly, and retroactively, rather than to redefine "claim" retroactively for all of Title 38.[27] In defending its proposed amendment, the Committee retraced the story of this circuit's aberrant reading of the former 38 U.S.C. § 211(a) and expressed

---

the Chairman of the House Committee on Veterans' Affairs included in H.R.Rep.No. 91–1166, *supra* note 7, at 19–24.

25. *Id.* at 24.

26. *Returning now to our discussion of judicial review of the Veterans' Administration's benefit determinations and H.R. 17564, it seems obvious that suits similar to the several hundred already filed can— and undoubtedly will—subject nearly every aspect of our benefit determinations to judicial review, including rating decisions, related Veterans' Administration regulations, Administrator's decisions, and various adjudication procedures.* Moreover, in the cases considered so far, the U. S. District Court has not been governed by the time limitations and conditions usually applicable under Federal statutes and rules governing suits against the United States or its officials when specific statutory authority has been granted for judicial review. One consequence of this is that judgments for retroactive benefits of over $18,000 for installments accruing from a period commencing as early as the 1940's

have been rendered, and these judgments have also ordered the Administrator to deduct as much as 25 percent attorneys' fees from the benefits due and to become due. The scope of the *Tracy* decision and the decisions upon which it is based is so broad that it could well afford a basis for judicial review of millions of decisions terminating or reducing many types of benefits provided under laws administered by the Veterans' Administration. Such review might even extend to the decisions of predecessor agencies made many years ago. On the other hand, this judicially authorized form of review is inherently unfair since it does not permit review of any decisions denying an original claim for benefits.

Officials of the Department of Justice have expressed grave concern regarding the scope and volume of litigation stemming from the *Tracy* decision. This, of course, is also a matter of great concern to the Veterans' Administration.
*Id.* at 23–24.

27. *Id.* at 10.

alarm that "suits in constantly increasing numbers have been filed in the U. S. District Court for the District of Columbia by plaintiffs seeking a resumption of terminated benefits."[28] These general comments give no indication that the proposed amendment was to upset final judgments no longer subject to appeal. On this issue the Committee's specific remarks directed at the proposed amendment are at best ambiguous:

> It seems to this committee that it is quite clear that the Congress, in enacting the exemption from judicial review in Public Law 866, 76th Congress, intended that exemption to be all inclusive and did not intend the fairly tortured construction adopted by the court of appeals in the *Wellman, Thompson,* and *Tracy* holdings.
>
> \* \* \*
>
> In view of the foregoing, this committee has included in H.R. 17958, a new subsection 8(a) which restates the provisions of subsection 211(a) of title 38, United States Code, to eliminate the word "claim" from that subsection. \* \* \* The provision is specifically made effective October 17, 1940, the date of enactment of Public Law 866, 76th Congress. The committee believes that this approach to solving the problem is preferable to that employed in H.R. 17564, i. e., adding a definition of the word "claim" to title 38, United States Code. The restated section 211(a) will make it perfectly clear that the Congress intends to exclude from judicial review all determinations with respect to noncontractual benefits provided for veterans and their dependents and survivors.
>
> \* \* \* \* \* \*

As noted above, a large percentage of the suits filed to date have involved the presumption of remarriage rule. A study of the first 32 judgments adverse to the Administrator of Veterans' Affairs has shown that accrued and estimated future payments in those cases alone will total in excess of $1.4 million. It is therefore apparent that the enactment of these provisions will result in substantial savings to the Government.[29]

It is arguable that the final paragraph implies an intent to upset the "first 32 judgments," but the ambiguities remain: Conceivably the Committee cited those judgments simply as a portent of future losses should the amendment not be enacted; and even if those judgments were a target of the amendment, it is not clear that the Committee thought them final and unappealable. The simple fact is that the Committee did not focus its attention on whether final judgments, no longer subject to appeal, should be upset. Rather, the Committee's conscious and stated objective was merely to "make it perfectly clear that the Congress intends to exclude from judicial review all determinations with respect to noncontractual benefits."[30] This objective can of course be met without providing *renewed* judicial review to *reopen* judgments already final.

Congress adopted the Committee's proposed amendment of Section 211(a) with a minimum of floor debate. The scattered remarks directed at the amendment were entirely general in character and indicated no awareness or intent that the amendment would come into conflict with final judgments no longer subject to appeal.[31]

28. *Id.*

29. *Id.* at 10–11.

30. *Id.*

31. The House debates are unilluminating. After Congressman Teague, Chairman of the Committee on Veterans' Affairs, read the Committee's report into the record, 116 Cong.Rec. (Part 15) 19732–19734 (1970), Congressman Saylor rose to support the amendment to 38 U.S.C. § 211(a):

> \* \* \* I believe there is considerable merit in the proposition of court review of certain decisions of the Veterans' Administration \* \* \*. \* \* \*
>
> \* \* \* \* \* \*
>
> If we are to have judicial review, Mr. Speaker, I hope it will result from the mature deliberations of 435 Members of the House of Representatives and the 100 Members of the other body, rather than from the erroneous interpretations of a

We turn next to the new section, 38 U.S.C. § 3111, which provides that "[t]here shall be no payment of * * * death compensation" when such "would not have been payable" under the VA's pre-1962 "standard for determining remarriage." The House Committee's explanation of this provision is very brief.

> The committee has also added subsection 8(b) to H.R. 17958. This language, which stems from H.R. 7624, 91st Congress, will expressly ratify the application of the Veterans' Administration administrative presumption of remarriage rule with respect to all pre-1962 cases. This action is deemed necessary because the judiciary has ignored the Congressional endorsement, in 1962, of that administrative practice.[32]

The question is whether the provision's no-payment command to the VA was meant by Congress to apply even where the payment is mandated by a final judgment no longer subject to appeal. The language of the provision does not say so; nor does the legislative history so indicate, the floor debates adding nothing to the House Committee's explanation of the provision's purpose.[33] Certainly we cannot hold that 38 U.S.C. § 3111 applies to final judgments merely because no express exemption for such judgments is carved into the provision. Such an exemption is rarely if ever contained in new legislation. The exemption is to be assumed unless the legislature speaks clearly to the contrary. Congress has not done so in this case.

■ We conclude that 38 U.S.C. §§ 211(a) and 3111 do not conflict with the validity and force of final judgments, like Mrs. Daylo's, which were no longer subject to appeal on the effective date of those statutory provisions, which adjudi-

---

small panel of jurists. The bill before the House makes clear the longstanding intent of Congress that all decisions of the Administrator involving noncontractual benefits should be exempt from judicial review. *Id.* at 19736. The bill was then passed 313 to 0. The bill originally passed by the Senate had not contained what eventually became § 8(a) & (b) of the Act. *See* S.Rep. No. 91–784, 91st Cong., 2d Sess. (to accompany S. 3348) (1970). Later, in recommending these House provisions to the Senate, Senator Talmadge stated that they would

> [s]trengthen the language of present law to clarify congressional intent that all decisions of the Administrator of Veterans' Affairs on questions of entitlement to veterans' benefits are final and not subject to judicial review * * *.

116 Cong.Rec. (Part 17) 23377 (1970). No further comments on the measures are recorded in the Senate. The bill was once more before the House on July 30, 1970, at which time Congressman Teague stated:

> Mr. Speaker, section 8 of the bill which we have under consideration in effect reiterates the longstanding policy and requirement found in VA laws, namely, that in any question of law or fact concerning a claim for benefits under any law administered by the Veterans' Administration the judgment of the Administrator of Veterans' Affairs shall be final and conclusive, and no court of the United States shall have power to review any such decision.

> * * * [T]here is no parliamentary question on this section. Both Houses have passed this language without any change and thus it is not in disagreement between the two Houses.
>
> * * * * *
>
> The reason for the inclusion of section 8 in this bill is because a recent court decision gave preferential treatment to a limited group of beneficiaries. If we are going to have court review it must apply to all beneficiaries with equal force. This the court is unable to do under existing law and sought to do in piecemeal fashion and, in my opinion, erroneously.
>
> * * * * *
>
> I am opposed to a windfall going to a particular class of beneficiaries or a particular group of lawyers who have interested themselves in the type of cases which are involved in this question and which are set forth in detail in the report on this bill * * *. * * *

116 Cong.Rec. (Part 20) 26489–26490 (1970). We acknowledge that none of these statements is *inconsistent* with an intent to upset final judgments no longer subject to appeal. But the fact remains that this intent is nowhere clearly expressed.

32. H.R.Rep.No.91–1166, *supra* note 7, at 11.

33. As indicated in note 31 *supra*, all discussion on the floor was directed to amendment of 38 U.S.C. § 211(a).

cated only past events, and which required merely a payment of benefits past due at the time of judgment.[34] It is conceivable that Congress intended such judgments to fall. But, if so, the intent was nowhere clearly expressed. In view of the serious constitutional problems which such an intent would raise, we are unwilling to impute it to Congress on the basis of ambiguous and fragmentary evidence. As passage of the two statutory provisions had no effect on the validity and force of Mrs. Daylo's judgment, the Administrator's motion under Rule 60(b) was properly denied.

Affirmed.

34. Put otherwise, we hold that the new legislative provisions do not affect judgments which are, in all but formal respects, identical with final money judgments. This statutory construction draws upon our examination of the constitutional precedents in Part II of this opinion. We note that money judgments themselves are not available in cases dealing with federal pension programs. See 28 U.S.C. § 1346(d) (1970).