**I.A.M. NATIONAL PENSION FUND, et al., Plaintiffs,**

v.

**WAKEFIELD INDUSTRIES, INC., et al., Defendants.**

Civ. A. No. 82–2187.

United States District Court, District of Columbia.

June 13, 1985.

Denis F. Gordon, David M. Ermer, Gordon & Barnett, Washington, D.C., Robert T. Osgood, Joseph P. Martocci, Jr., I.A.M. Nattional Pension Fund, Washington, D.C., for plaintiffs.

Joseph Sharlitt, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

The matter before the Court involves the interplay of a recent federal statute, the Deficit Reduction Act of 1984, with a well settled principle of constitutional law, the separation of powers between the legislative and judicial branches of government.

To place the matter in context, the Court will first trace the history of this litigation and the corresponding history of the statute involved.

The I.A.M. National Pension Fund (the Fund) brought the present lawsuit in August, 1982 to collect from the defendants [1] the "withdrawal liability" imposed by the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381, *et seq.* Under the MPPAA, Congress established this new statutory liability, known as "withdrawal liability," for any employer who withdraws from a multiemployer pension fund. Even though the MPPAA did not become effective until September 26, 1980, liability was imposed retroactively to include any withdrawal occurring after April 28, 1980. This retroactive liability in the so-called "window period" (from April 28 to September 26, 1980) was upheld as constitutional in *Pension Benefit Guarantee Corp. v. R.A. Gray,* —— U.S. ——, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984).

On November 23, 1983, this Court entered summary judgment for the plaintiffs against all corporate defendants for withdrawal liability occurring in the window period. The Court denied plaintiffs' motion for summary judgment against defendant Margolis on the grounds that the factual record was insufficient to impose personal liability. On December 12, 1983 a final judgment was docketed jointly and severally against all corporate defendants. No appeal was ever noticed.

The parties then continued discovery concerning Margolis' personal liability under the corporate veil doctrine. Before the close of discovery, however, Congress enacted the Tax Reform Act of 1984 (the Act), Pub.L. No. 98–369, 98 Stat. 494 (1984). Section 558 of that Act purports to extinguish all withdrawal liability for withdraw-

---

1. The defendants included Wakefield Industries and the alleged corporate alter egos of Wakefield including Capehart Corporation, Wakefield Industries, Inc. (Delaware), Sprague Industries, Inc., and the individual defendant, Marvin Margolis.

als occurring during the window period established by the MPPAA.

According to defendant Margolis, the enactment of Section 558 eliminates any potential liability in this case and justifies the immediate dismissal of this action. Plaintiffs argue that Section 558 cannot be applied in a fashion that would "effectively nullify" the final judgment of this Court. The Court will now turn to these arguments.

### Congressional Authority to Modify Federal Court Jurisdiction

The debate over congressional authority vis-a-vis the federal courts has raised some difficult and controversial questions in recent times. *See e.g.,* Sager, Foreword: Constitutional Limitations on Congress' Authority to Regulate the Jurisdiction of Federal Courts, 95 Harv.L.Rev. 17 (1981); Redish, Constitutional Limitations on Congressional Power to Control Federal Jurisdiction: A Reaction to Professor Sager, 77 Nev.U.L.Rev. 143 (1982). Fortunately, the issues posed by this case follow a better-worn path of precedent.

It has been established, at least since *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871), that Article III of the Constitution places some limits on congressional authority to intrude on the decisional independence of the judiciary. In particular, *Klein* holds that Congress may not enact jurisdictional limitations in order to control or reverse the results in a particular case.

This principle of separation was clearly enunciated by this Circuit in *Daylo v. Administrator of Veterans Affairs,* 501 F.2d 811 (D.C.Cir.1974). In *Daylo,* the plaintiff, a veteran's widow had her statutory benefits cancelled because of a Veterans Administration (V.A.) finding that she had not met her administrative burden of proving that she had "not remarried."

Under the law in effect prior to 1962 the term widow was defined by statute as a "woman who was the wife of a veteran ... and who has not remarried...." 38 U.S.C. § 101(3). The V.A. followed an administrative practice of shifting the burden of proof on the issue of remarriage to any "widow" who was living with another man. This practice was not approved by this Court. *See Daylo* at 813.

In 1962 Congress amended the V.A. statute to provide that a "widow" would be ineligible for benefits if she "lived with another man and held herself out openly to the public to be the wife of such other man." Act of Sept. 19, 1962, Pub.L. 87–674, 76 Stat. 558 (amending 38 U.S.C. § 101(3)). This bright-line rule went beyond the V.A. practice of merely shifting the burden on the "remarriage" issue to widows who lived with other men. However, the statute was given only prospective application.

In 1969, Mrs. Daylo filed her suit in this Court, seeking to compel payment of the benefits that had been denied her since 1951. In 1970, the District Court entered judgment for Mrs. Daylo for all benefits payable prior to September 19, 1962, the effective date of the amendment discussed above.

This partial summary judgment had become final and unappealable by the time the V.A. statute was amended again by the Act of August 12, 1970, Pub.L. 91–376, 84 Stat. 787. The 1970 amendments made two crucial changes in the existing law. First, it provided that there would be no payment of benefits "because of a widow's relationship with another man before enactment of [the 1962 amendments]" that would not have been payable by the V.A. under the "standard for determining remarriage applied by that agency before said enactment." 38 U.S.C. § 3111. This language ratified the V.A.'s burden shifting rule and, in effect, reversed the judicial rule of decision in Mrs. Daylo's case. Second, the 1970 amendments retroactively reversed the jurisdictional position of the District of Columbia Circuit by making clear that the deci-

sion of the V.A. was absolutely unreviewable.[2]

The V.A. claimed that the new act, 38 U.S.C. § 211(a), conflicted with Mrs. Daylo's judgment both by "retroactively withdrawing the jurisdiction of the court" and by providing a rule for determining remarriage "directly contrary" to that applied by the District Court. *Daylo* at 815. The court refused to accept the V.A.'s reading of the statute, noting that any attempt "to upset final judgments" would present a serious constitutional dilemma." *Id.* at 816.

The court then quoted the "long standing" rule in such cases:

It is not within the power of a legislature to take away rights which have been once vested by a judgment. Legislation may act on subsequent proceedings, may abate actions pending, but when those actions have passed into judgment the power of the legislature to disturb the rights created thereby ceases.

*Id.* (quoting *McCullough v. Virginia,* 172 U.S. 102, 123–24, 19 S.Ct. 134, 141–42, 43 L.Ed. 382 (1898) ). The Court held that the rule was based on the constitutional principle of "independence of the judicial branch of government," *id.* at 816, but noted that there were limited "exceptions to the general rule."

Those "exceptions," in cases such as *Pennsylvania v. Wheeling & Belmont Bridge Co.* (Wheeling Bridge case), 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855), and *Hodges v. Snyder,* 261 U.S. 600, 43 S.Ct. 435, 67 L.Ed. 819 (1923), all involved cases where the congressionally modified judgment was not an award of money damages but rather an "injunctive decree ... directly affect[ing] public rights." *Id.* at 817. Thus the court was able to summarize that the "general, constitutional rule" was that "rights vested in final judgments, no longer subject to appeal, are immune from leg-

islative alteration"; the only major exception depended on the characterization of the remedies involved. Judicial decrees in equity were generally "vulnerable" to legislative modification because of the "legislative" nature of the decrees: their prospective effect on the rights of persons not privy to the judgment. *Id.* at 818. Faced with this potential constitutional conflict the court declined to adopt the V.A.'s construction of the statute, and therefore declined to modify Mrs. Daylo's judgment.[3]

### Statutory Construction of Section 558 of the Tax Reform Act of 1984

The Court has before it a case which is virtually on all fours with *Daylo*— at least in reference to the constitutional question raised. Defendant has asked that this action be dismissed because Section 558 of the 1984 Tax Reform Act has rendered the previously-entered final judgments "void." However, the Court finds that Section 558 may be construed in a way that will avoid the constitutional confrontation inherent in defendants' position.

■ Section 558, titled "Elimination of Retroactive Application of Amendments Made by Multiemployer Pension Plan Amendments Act of 1980," provides as follows:

(1) LIABILITY.—Any withdrawal liability incurred by an employer pursuant to [ERISA] as a result of the complete or partial withdrawal of such employer from a multiemployer plan before September 26, 1980, shall be void.

(2) REFUNDS.—Any amounts paid by an employer to a plan sponsor as a result of such withdrawal liability shall be refunded by the plan sponsor to the employer....

Tax Reform Act of 1984, § 558, Pub.L. 98–369, 98 Stat. 494, 899 (1984). It is cer-

---

**2.** The statute had always contained a "no review" provision but the D.C. Circuit had construed the statute to allow review of benefit terminations, but not of denials of benefit claims. *See e.g., Tracy v. Gleason,* 379 F.2d 469 (D.C.Cir.1967).

**3.** *Cf. Battaglia v. General Motors Corp.,* 169 F.2d 254 (2d Cir.1948) (upholding dismissal of claims which had "not ripened into final judgment" where subsequent amendment of legislation modifies statutory rule of decision).

tainly possible to read the words of this statute in several ways that appear to fulfill the intent of Congress. In this situation, it is a "cardinal principle" that courts must "first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided." *Johnson v. Robison*, 415 U.S. 361, 367, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974). "[W]hen one interpretation ... would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a 'clear statement' of a contrary legislative intent." *United States v. Thompson*, 452 F.2d 1333, 1337 (D.C.Cir.1971). *See also United States Civil Service Comm'n v. National Association of Letter Carriers, AFL-CIO*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Palmore v. Superior Court of the District of Columbia*, 515 F.2d 1294 (D.C.Cir.1975).

In brief, the statute provides that "[withdrawal] liability ... shall be void" and "any amounts paid ... shall be refunded." The Court finds that it is both reasonable and consistent to read this provision as *excluding* any such liability that is reduced to final judgment.

Of course, withdrawal liability is supposed to be paid voluntarily by the employer. *See* 29 U.S.C. § 1399(c)(2). Thus, in the majority of cases—where the employer voluntarily complies with the law—Section 558 provides that window period payments must be refunded. The statute can be fairly interpreted as "voiding" that liability and requiring a refund of such voluntary payments. Such an interpretation is also consistent with a dismissal of any civil action in which the pension fund sued to collect such withdrawal liability but had not yet reduced its claims to final judgment. *See I.A.M. National Pension Fund v. Allied Corp.*, 596 F.Supp. 481, 483 (D.D.C. 1984), *appeal docketed*, No. 184–5869 (D.C. Cir.); *I.A.M. National Pension Fund v. Stockton TRI Industries*, 598 F.Supp. 267,

269 (D.D.C.1984), *appeal docketed*, No. 84–5944 (D.C.Cir.); *I.A.M. National Pension Fund v. Jerry Nuzum Chevrolet, Inc.*, No. 81–2772 (D.D.C. March 8, 1985), *appeal noticed* on March 11, 1985. In addition, there is nothing in the admittedly slight legislative history which conflicts with this interpretation of Section 558. *See* Deficit Reduction Act of 1984: Explanation of Provisions Approved by the Committee on March 21, 1984; Senate Committee on Finance, 98th Cong., 2d Sess., 337; 130 Cong. Rec. H7091–94 (daily ed. June 27, 1984).

 Accordingly, the Court will adopt the interpretation of Section 558 urged by the plaintiffs and hold that the statutory language "voiding" withdrawal liability does not reach any such liability which has been reduced to final judgment.[4] An appropriate order will issue in accordance with the terms of this opinion.

---

**4.** Of course, any part of this action which relied on *pending* issues involving window period liability would have to be dismissed. However, all of the remaining issues in this case involve

counterclaims or questions of derivative liability (i.e., Margolis' personal liability for the corporate acts) not dependent on the character of the underlying action.